MARIE LEVINS v. ALBERT VIGNE, Appellant.—98 S. W. (2d) 737.

Division One, November 12, 1936.*

---

*NOTE: Opinion filed at September Term, 1935, April 23, 1936; motion for rehearing filed; motion overruled at September Term, 1936, November 12, 1936.

S. P. *McChesney* and *Erwin F. Vetter* for appellant.

*Eagleton, Waechter, Yost, Elam & Clark* and *Berryman Henwood* for respondent.

FERGUSON, C.—The plaintiff herein is the widow of Lawrence Levins, deceased, and as such brought this action, under the wrongful death statute, for damages on account of the death of her husband alleged to have been caused by the negligence of defendant in the operation of an automobile. In the early morning hours of January 1, 1932, defendant was driving his automobile along Page Avenue in St. Louis County. Levins was prostrate in the center of the street in a "crouched position." Defendant's automobile "straddled" Levins and his body was caught and wedged underneath the automobile. Later and some distance from that point discovery was made that Levins was being dragged under the automobile and thereupon he was removed, found to be unconscious and seriously injured and was sent to a hospital where he died on January 9, 1932. This action resulted in a verdict for plaintiff in the amount of $10,000 and defendant has appealed from the judgment thereon.

The petition alleged several grounds of negligence but, abandoning the other grounds alleged, plaintiff submitted the case to the jury under the humanitarian rule alone. Appellant having timely moved

for a directed verdict in his favor on the ground that under the whole evidence a submissible case had not been made renews that contention on this appeal and also assigns as error the refusal of the trial court to give two instructions, D and E, which he requested.

In the statement of facts which follows we set out the evidence most favorable to plaintiff's contention, which we must accept and consider in ruling the assignment that a submissible case was not made. Page Avenue is an east and west street. The evidence refers to that section of Page Avenue between Ferguson Avenue, an intersecting north and south street on the east and Pennsylvania Avenue, a north and south intersecting street on the west, a distance of 1870 feet. There are four blocks of varying length between Ferguson and Pennsylvania avenues. From Ferguson to Pennsylvania Avenue Page Avenue is a paved street sixty feet in width with three lanes of travel on either side of the center line; the three lanes north of the center line for traffic traveling west and the three lanes south thereof for eastbound traffic. A building occupied by the Dorn Automobile Agency is situate on the north side of Page Avenue approximately 1180 feet west of Ferguson Avenue, 690 feet east of Pennsylvania, and about 25 feet for the north line of the street. Lawrence Levins was twenty-eight years of age, and a "strong, robust man." He was employed as a truck driver by an express company. On the night of December 31, 1931, Levins accompanied a friend, Anton Bosel, to the Dorn Automobile Agency where he, Bosel, Charles F. Dorn and Martin E. Gereau engaged in playing pinochle. The card game continued until "fifteen or twenty minutes after one o'clock" of the morning of January 1, 1932. During the game "a few rounds of high balls" were served. At the conclusion of the card game at one-fifteen or one-twenty A. M. the four men separated going to their respective homes. It was necessary for Levins to cross Page Avenue and he went alone in that direction. At that time no street lights were burning in that immediate vicinity and the nearby houses and stores were dark. The witnesses in describing the weather conditions prevailing at that time say "it was misting a little," was "a little misty" and "kinda misty." About one-thirty A. M. Edward J. Weber and wife were driving west in their automobile on Page Avenue between Ferguson and Pennsylvania avenues. Their automobile was traveling in the north lane. As they reached a point "about a quarter of a block (95 feet) west" of the Dorn Agency they discerned an object having the appearance of a person lying in the center of the street at the left or south of their line of travel. As they were traveling in the north lane this object was therefore approximately forty feet south of their automobile. They stopped their automobile, got out and together started toward the object which they then recognized to be a man prostrate in the street. The

man, who .was Levins, wore a "light" colored overcoat and was in a· "crouched position." As the Webers reached the third lane from the north side of the street and were at a point opposite Levins they discovered the approach of defendant's automobile from the east traveling "about the center of the street." This automobile was owned, and at the time was being driven, by defendant who was accompanied by his wife. Defendant's automobile was at that time "something like a block and a half away"—the length of the blocks at that point with intervening street, as shown by a plat in evidence, considered that distance would be at least 500 feet. Realizing that if defendant's car continued in the course it was then traveling it would strike Levins both the Webers commenced to "wave" with their hands "at" defendant's approaching automobile in an attempt to attract the driver's attention and "make him stop" or swerve his automobile and avoid striking Levins. The headlights on defendant's automobile were lighted. Though the Webers continued to wave and gesticulate in an attempt "to flag" and "stop" defendant's automobile there was no slackening of speed and the automobile continued in its course with a slight increase in speed as it passed the Webers and passed over or "straddled" Levins' body which was caught and wedged under the automobile and carried away. The route of defendant's car thereafter, by streets and blocks, is shown by the evidence and the points referred to, as well as the approximate distances, were doubtless known to the jury. Sometime later and after traveling a distance which is referred to in respondent's brief as approximately two miles west of the point where Levins had been "picked up" by defendant's automobile a Mr. and Mrs. Deatherage and Dorothy Ferguson the occupants of another automobile which came up behind defendant's automobile saw Levins' body being dragged under defendant's automobile. They drove alongside defendant's automobile and called to him. Both automobiles were stopped and defendant and Deatherage endeavored to release Levins but were unable to do so. The automobile was "jacked up" to relieve the pressure on Levins and the police department of University City was notified by telephone. Police officers responded and succeeded in freeing the unconscious man and removed him to a hospital. Levins' left shoulder was "tightly" wedged or caught between the connecting rods underneath the front part of the automobile. In that position he had been carried with the lower part of his body and legs dragging and striking upon the street from the point on Page Avenue where he had been "picked up" by defendant's automobile. As noted, supra, Levins died on January 9, 1932, as a result of the injuries from which he was suffering when taken to the hospital. Reverting now to the further evidence relating to events immediately preceding the happening on Page Avenue when

Levins was "picked up" by defendant's automobile. Defendant entered Page Avenue "five or six blocks east of Ferguson Avenue" and at the time his automobile "picked up" Levins had traveled west on Page a distance of approximately eight or nine blocks. The Webers and defendant and wife stated that there was no traffic on Page in either direction and neither saw any automobiles or other traffic going west nor met or saw any traffic going east on Page prior to time defendant's automobile picked up Levins. Defendant stated that "when we got to Ferguson Avenue we saw the tail light" of the Weber automobile and noted that it was parked on the north side of Page with the headlights "full on;" that "right away our attention" was attracted "to that car;" that he and his wife feared "a holdup;" that he continued to watch the Weber automobile; that he saw the Webers get out of their automobile and go toward the center of the street and that they were "making some kind of motion for us to stop;" that his attention was directed to the Webers standing in the street and thinking "it was a holdup" he increased speed as he neared the point where the Webers were standing, passed them and continued on; that he was driving at a speed of about twenty-five miles an hour and increased the speed to thirty or thirty-five miles an hour as he neared that point. Defendant said; that he had his automobile under control; that it was equipped with "good brakes" and "headlights as good as those on the average car;" that "I had my headlights on full" and they projected the light down upon the street and ahead; that by the light of his headlights he "could have seen a person walking in the street a 100 feet away;" that it was misting but the "windshield wiper was working;" that he "had a clear space through the windshield" and "could see very readily everything in the street;" and that at the speed he was driving and under the conditions prevailing at the time he "could have comfortably stopped the car" in a space of "between 40 and 50 feet." In fact defendant does not seem to have advanced the claim that had he looked he could not, under the circumstances there existing, have seen Levins' perilous situation in time to have stopped or swerved the car and thereby have avoided the contact but stated that the only reason he did not see Levins was "because" he "was looking at" the Webers and that had not his attention been wholly directed to the Webers in the belief that they were attempting a holdup he could have seen anyone in the street." These statements were supplemented with the further statement that if he had "wanted" to do so and had "thought the circumstances required" he could have stopped his automobile before reaching the point in the street opposite the Webers, where Levins was lying in the street, but he "didn't think it was necessary and that is the reason he didn't stop."

Appellant would have us declare, that it so conclusively ap-

pears from the foregoing evidence that reasonable minds could not well differ, and as a matter of law, that defendant could not by the exercise of the highest degree of care, under the circumstances there existing, have discovered Levins' perilous situation in time to have thereafter, with the means at hand and reasonable safety to his automobile and the occupants thereof, avoided driving his automobile over and against Levins. But we have recited the evidence as to distances, speed, weather conditions, lights, visibility, defendant's admissions and other facts and circumstances bearing on the elements necessarily involved from which, considered in the light most favorable to plaintiff's theory and allowing the fair and reasonable inferences arising therefrom, we think a jury might well find that defendant was negligent under the humanitarian rule. In this connection appellant argues that believing the Webers were attempting a ''holdup'' his attention was thereby diverted from the street ahead and that under such circumstances and in such situation of apprehended peril to his wife and himself he could not, in the exercise of the highest degree of care, both have met the threatened danger and have timely discovered Levins' presence in the street and in the path of his automobile. In applying the humanitarian doctrine defendant's conduct must be measured by what, in the exercise of the highest degree of care, he could and should have done under the existing circumstances which is ordinarily for the jury on the facts of the case. The contention presents a jury question and not one which the court can rule as a matter of law. A further contention is that the evidence does not show that ''defendant was guilty of negligence which was the proximate cause of the death of the deceased.'' There was evidence that the card game ''broke up'' about one-twenty A. M. after which the four men departed for their respective homes; that ten minutes after the time it is said the card game ''broke up,'' or one-thirty A. M., the Webers discovered Levins lying in a ''crouched position'' prostate in the center of Page Avenue, opposite a point a ''quarter'' of a block, or ninety-five feet, west of the Dorn Agency which would indicate that in the ten minutes following the breaking up of the card game Levins had put on his hat and overcoat, taken leave of his companions and walked to the point where he was found by the Webers in the street and in some unexplained, and apparently unknown, manner had there fallen or been knocked down. We noted, supra, that defendant, his wife and the Webers all testified that there were no automobiles or other traffic on Page at the time except the automobiles of Weber and defendant nor had either of them seen any other automobiles or traffic moving in either direction on Page prior thereto. Dr. Will who attended Levins testified that he ''was suffering from an intra-cranial injury; a head injury; large, deep rows on his left hip and the left ankle particularly over the soft structures

which had been rubbed off down to the bone; he had a fracture of the styloid process of the left wrist, and numerous bruises and contusions over his body" and that these injuries caused his death. The doctor further testified that in his opinion the manner in which Levins was "picked up" by defendant's automobile, the position in which his body was caught and wedged under the automobile and dragged, all as shown by the evidence, could have caused the injuries he had described and which resulted in his death. The testimony tends to show that during the time intervening before death Levins was for the most part "irrational" though at times "partly rational." Plaintiff, the widow, was notified of the accident and went to the hospital about eight-thirty or nine o'clock the same morning. She testified that her husband was conscious at the time. She was then asked about his condition in reference to injuries followed by this question: "Did your husband make any reference to how he got in that condition?" Her answer was: "Told me he was crossing the street on Page and struck by a machine that is the way he told me." Appellant seizes upon this statement and makes an extended argument here claiming that it was thus conclusively shown that Levins had been struck by an automobile driven by a "hit and run" driver prior to the time the Webers arrived on the scene and that the court should declare as a matter of law that the act of the supposed "hit and run driver" was the proximate cause of the injuries sustained by Levins and the defendant's act at most but a remote cause. We deem it unnecessary to review and analyze the cases cited in connection with this argument. It suffices to say that the testimony hardly sustains the premise appellant adopts that it conclusively shows, and cannot be otherwise understood or interpreted, that some other automobile had previously struck Levins and knocked him down. We think that and the whole question of proximate cause was on the facts one for the jury. The constitutive facts of a prima facie case under the humanitarian rule appearing from the evidence tending to sustain that theory of negligence a submissible case was made.

The appellant requested the following instruction which the court refused:

"The court instructs the jury that if you find and believe from the evidence that plaintiff's decedent was struck by an automobile and left lying in the highway and received injuries therefrom prior to being picked up, carried and dragged by the defendant's automobile, which could have caused his death, or if you are unable to determine from the evidence, which injuries, if any, caused his death, then you are further instructed that you cannot find a verdict against defendant upon mere supposition or conjecture that the injuries received from the picking up, carrying and dragging of plaintiff's decedent by the defendant's automobile was the sole cause of his death."

Appellant assigns the refusal of the trial court to give the instruction as error. It is doubtful that there is any substantial evidence tending to show decedent "was struck by an automobile and left lying in the highway . . . prior to being picked up, carried and dragged by defendant's automobile." We have heretofore noted the lone bit of testimony upon which defendant relies as tending to show that, viz.: plaintiff's testimony that her husband told her "he was crossing the street on Page and struck by a machine." If it be granted that from that detached statement the inference can reasonably be drawn that Levins was struck by an automobile and left lying in the street prior to the time defendant's automobile ran over and against him there is no evidence as to what injuries he then sustained or that he thereby sustained injuries "which could have caused his death." Dr. Will testified to the injuries which he found and without specifying that any particular injury caused death said the injuries described caused death. The effect of his testimony was that the various and numerous injuries combined or concurred to cause death. Assuming that the jury would have been warranted in a conclusion from the evidence that an automobile struck Levins and knocked him down and that he was left in the street in the position he was when defendant's automobile ran over and against him and that he thereby sustained some of the injuries enumerated by Dr. Will the instruction seems to lay down the proposition, or convey the direction, that the jury could not find for plaintiff, though they believed defendant negligently ran his automobile over and against Levins, unless they could separate the injuries resulting from defendant's negligent act from the injury or injuries sustained when struck by the supposed first automobile and further find that such injuries were the sole cause of death. The instruction excludes liability on the part of defendant for negligence which caused an injury or injuries contributing to or combining or concurring with the other prior injuries to cause death. 1 Thompson on Negligence, section 75, states the rule thus: "If the concurrent or successive negligence of two persons, combined together, results in an injury to a third person, he may recover damages of either or both, and neither can interpose the defense that the prior or concurrent negligence of the other contributed to the injury." Assuming the facts predicated in the instruction as being in evidence nevertheless defendant would be liable if his negligent act proximately contributed to the injuries which caused death. [See Newcomb v. New York Central & Hudson River Railroad Co., 169 Mo. 409, 69 S. W. 348; Krehmeyer v. St. Louis Transit Co., 220 Mo. 639, 120 S. W. 78; Carr v. St. Louis Auto Supply Co., 293 Mo. 562, 239 S. W. 827; Thompson v. Schultz (Mo. App.), 296 S. W. 205.] It was not error to refuse the instruction in the form offered.

■ The refusal of an accident instruction is assigned as error.

This assignment does not require an extended discussion. When such an instruction should or should not be given has been many times ruled by the appellate courts of this State. The cases are collected and reviewed and the rule well stated in Hogan v. Kansas City Public Service Co., 322 Mo. 1103, 19 S. W. (2d) 707. [See, also, Kaley v. Huntley, 333 Mo. 771, 63 S. W. (2d) 21, and Noce v. St. Louis-San Francisco Ry. Co., 337 Mo. 689, 85 S. W. (2d) 637.] Applying the rule laid down in the foregoing cases to the facts of the present case and the issues involved the trial court properly refused the instruction.

No reversible error appearing the judgment is affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.